IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOSHUA CANE JELLISON, and<br>JESSICA MARIE JELLISON<br><br>                    Plaintiffs,<br><br>        v.<br><br>PHH MORTGAGE CORPORATION<br><br>                    Defendant. | )<br>)<br>)<br>)  Civil Action No. 2:23-cv-739<br>)  Judge Nora Barry Fischer<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM OPINION**

I. INTRODUCTION

Presently before the Court is Defendant PHH Mortgage Corp.'s ("PHH") Renewed Motion in Limine to Exclude Expert Witness Key Coleman ("Coleman") (ECF No. 82). Defendant filed a Brief in Support of the Motion (ECF No. 83) along with a copy of Key Coleman's Report and deposition. (ECF Nos. 82-1 & 82-2, respectively). Plaintiffs Joshua Cane Jellison ("Joshua") and Jessica Marie Jellison ("Jessica") (collectively "Plaintiffs") filed an opposition brief (ECF No. 88), followed by PHH's reply brief (ECF No. 89). Plaintiffs did not file a sur-reply. On November 13, 2025, the Court held a hearing and oral argument on the Motion wherein expert Coleman testified. (Hearing Transcript, ECF No. 96). No further briefing was requested by the parties. For the reasons discussed below, the Motion will be denied.

II. FACTUAL BACKGROUND

In October 2018, Plaintiffs took out a mortgage for the purchase of their home in Latrobe, Pennsylvania through Plaza Home Mortgage ("PHM"). (Complaint, ECF No. 1-2 ¶ 5). In May 2020, PHM assigned its right and interest in the Mortgage to Defendant PHH. (*Id.* ¶ 6). In March 2020, Plaintiffs were notified that due to the COVID-19 pandemic, they were not required to make

their monthly payments due to a temporary mortgage forbearance and were directed to complete an application for mortgage assistance. (*Id.* ¶ 7). Plaintiff completed and submitted their application on March 20, 2020, and their application was approved. (*Id.* ¶ 8). After 12 months, the mortgage forbearance ended, and PHH began seeking payment for the missed mortgage payments, or an agreement for repayment. (*Id.* ¶ 9).

To this end, PHH offered a resolution for the delayed payments in the form of an FHA COVID-19 Recovery Standalone Partial Claim Mortgage ("PCM"), in which the outstanding debt would be secured with a second mortgage that would not require any monthly payments until the property was sold or the Plaintiffs' mortgage with PHH was paid off or refinanced. (*Id.* ¶¶ 10-11). Moreover, the PCM would not carry any interest and did not require any fees or charges. (*Id.* ¶ 12).

Plaintiffs accepted PHH's offer, completed the required paperwork, and submitted the paperwork as directed by PHH. (*Id.* ¶ 13). PHH, however, rejected the submission, instructed Plaintiffs to resubmit the paperwork, and set a new due date. PHH claimed that the original paperwork arrived late, even though it was delivered by Federal Express and was timely delivered. (*Id.* ¶¶ 15-16).

Plaintiffs followed PHH's instructions, but their application was again denied due to the notary using Joshua's middle initial as opposed to his full name. (*Id.* ¶ 17). Despite being preapproved and submitting the required documentation twice, PHH issued a Notice of Intent to Foreclose on May 3, 2022, because of the outstanding balance of the delayed mortgage payments. (*Id.* ¶ 18).

Thereafter, Plaintiffs retained counsel, and PHH again offered Plaintiffs the PCM to resolve the delayed mortgage payments. (*Id.* ¶ 19). Plaintiffs accepted the offer and resubmitted

the required documentation.  (*Id.* ¶ 20).  The paperwork was due by May 23, 2022.  (*Id.* ¶ 21).  Plaintiffs mailed the completed PCM documents on May 20, 2022, via Federal Express, which were delivered to PHH on May 23, 2022, at 8:52 a.m.  (*Id.* ¶ 22).  Plaintiffs were also required to make a monthly payment of $2,179.46 by June 1, 2022.  (*Id.* ¶ 23).  Plaintiffs mailed the required monthly payment on May 20, 2022, thereby completing the process for entering the PCM, and placing their account in good standing.  (*Id.* ¶¶ 24-25).

On June 14, 2022, Plaintiffs learned that PHH again rejected their PCM application.  No written notification of rejection was sent to Plaintiffs or their attorney.  (*Id.* ¶ 26).  In rejecting the application, PHH indicated that it "did not like the notary's handwriting with respect to Jessica's middle name as it was written on one of the documents, claiming that "Marie" looked like "Marre." (*Id.* ¶ 27).  That same day, PHH emailed an unexecuted Promissory Note and PCM, and directed Plaintiffs to re-complete and re-submit the paperwork, and mail it by Federal Express so that it would be delivered during the beginning of the following week.  (*Id.* ¶ 29).  Plaintiffs followed PHH's instructions and mailed out the required documentation by Federal Express on June 17, 2022.  (*Id.* ¶ 30).  PHH received the completed paperwork on June 20, 2022, at 9:02 a.m.  (*Id.* ¶ 31).  PHH again rejected the paperwork.  (*Id.* ¶ 32).  Plaintiffs later learned on June 29, 2022, during a previously scheduled phone call with PHH, that the paperwork was rejected because it was due by June 18, 2022.  (*Id.* ¶ 33).  No written notice of the denial was sent to Plaintiffs or their attorney.  (*Id.* ¶ 34).

Plaintiffs then sent an appeal letter to PHH on July 1, 2022.  (*Id.* ¶ 35).  PHH sent new Notices of Intention to Foreclose Mortgage to Plaintiffs while their appeal was pending.  (*Id.* ¶ 36).  In addition, around July 8, 2022, Plaintiffs received an "off-Scheduled Escrow Statement" dated June 27, 2022, in which PHH notified Plaintiffs that there was a surplus of $1,314.54 in their

3

escrow account and that PHH was retaining it due to the alleged delinquent mortgage. (*Id.* ¶ 37). Plaintiffs then sent an appeal letter to PHH concerning its decision to retain the escrow overage. (*Id.* ¶ 38). As of the filing of the Complaint on April 11, 2023, PHH never responded to the appeal, nor has it returned the escrow overage. (*Id.* ¶ 39).

Simultaneously, PHH continually stated that it did not have proof of hazard insurance coverage for random time frames and stated that it was going to force purchase insurance on Plaintiffs' behalf in the amount of $1,258.00, and that it would credit that amount upon proof of coverage. Plaintiff forwarded proof of insurance for various dates for which PHH indicated there was no insurance. PHH never provided proof that it issued a $1,258.00 credit. (*Id.* ¶¶ 41-47). PHH also indicated another gap in insurance and force purchased insurance in the amount of $165.00. (*Id.* ¶¶ 48-51). Plaintiffs provided proof of coverage and requested a credit of the $165.00. As of the filing of the Complaint, PHH did not respond to Plaintiff's request for a credit. (*Id.* ¶¶ 52-53).

After months of attempting to foreclose on the Plaintiffs' mortgage, PHH reversed its denial of the PCM and directed the Plaintiffs to forward an $8,717.84 payment, even though they had been making their monthly payments while the various attempts to secure the PCM were in process. Nevertheless, Plaintiffs forwarded the payment. (*Id.* ¶¶ 54-55).

Plaintiffs also learned that PHH did not pay Plaintiffs' property taxes from their escrow account for the 2022 tax year and failed to notify them of the same. (*Id.* ¶¶ 56-57).

III. RELEVANT PROCEDURAL HISTORY

Plaintiffs filed their Complaint in the Court of Common Pleas of Westmoreland County on April 11, 2023. (ECF No. 1-2). On May 3, 2023, Defendant PHH removed the civil action to the United States District Court for the Western District of Pennsylvania. (ECF No. 1). Plaintiffs

allege five (5) counts for violation of the Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1 *et seq.*, and two counts for breach of Fiduciary Duty. They allege generally that they incurred damages because their credit score was substantially reduced which severely affected their ability to run their business. Other damages include attorney's fees necessary to secure their entry into the PCM and to prevent PHH from foreclosing on their property; substantial notary fees; $1,314.54 in escrow surplus improperly retained by PHH; $165 for homeowners' insurance; and $8, 717.84 that Plaintiffs were forced to pay upon reversal of the PCM denial. They also seek punitive damages. (ECF No. 1-2)

Defendant filed a Partial Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) with supporting brief on May 9, 2023. (ECF Nos. 5 & 6). Plaintiff filed a Brief in Opposition on May 23, 2023. (ECF No. 10). On June 22, 2023, the Court entered a Memorandum Order granting the Motion and dismissed the two counts for Breach of Fiduciary Duty. (ECF No. 13). The five (5) counts for violation of the Unfair Trade Practices and Consumer Protection Law remain.

With the submission of Coleman's Report, Plaintiffs' alleged damages increased to just over $1 million. Coleman itemizes the following five (5) elements of damages, some of which were allegedly incurred as a result of the drop in Plaintiffs' credit scores: 1) $600,100 for Loss of Triaxle Truck Rental Opportunity; 2) $322, 606 for Lost Core Business Expansion; 3) $66,371 for Lost Profit from House Refurbishing Project; 4) $48, 483 for loss of Mortgage Refinancing Opportunity; and 5) $3, 348 related to Taxes, Insurance and Escrow Issues. (ECF No. 51-3 at 5-9). PHH filed a Motion for Sanctions and supporting brief seeking to bar Plaintiffs from seeking economic damages. (ECF Nos. 49 & 50). PHH also filed a Motion to Exclude Expert Witness

Key Coleman with supporting brief. (ECF Nos. 51 & 52). Plaintiffs timely filed their responsive briefs. (ECF Nos. 56 & 57, respectively). PHH filed its Replies. (ECF Nos. 59 & 60).

The Court held oral argument on the Motions on February 26, 2025, wherein the Court ordered that Plaintiffs' counsel either mail or hand deliver to the Court documents upon which Coleman relied in drafting his Report. The Motions were taken under advisement. (ECF No. 63). Thereafter, the parties agreed that Plaintiffs would waive any right to seek economic damages for the Loss of the Triaxle Truck Rental Opportunity and the House Refurbishing Project. The parties further agreed that Plaintiffs' claim for economic damages related to the Loss of Opportunity to Expand Core Business would remain, along with Plaintiffs' claim for Loss of Mortgage Refinance Opportunity, and Plaintiffs' actual damages, which includes their claimed losses relating to taxes, insurance, and escrow. The parties' agreement was memorialized in the Court's Order of March 14, 2025. (ECF No. 68). The March 14, 2025, Order also provided that discovery would be reopened for the limited purpose of exploring the expert opinion of Coleman, and documents he relied upon as they relate to the remaining damages. (*Id.*)

On July 22, 2025, the Court held a telephone post-fact discovery status conference. (ECF No. 80). The Court established a briefing schedule and hearing date on the Motion to exclude Plaintiffs' Expert Witness and deferred setting a briefing schedule on summary judgment motions until further order of court. (*Id.*)

On August 25, 2025, PHH filed the Renewed Motion to Exclude Expert Witness currently at bar. (ECF No. 82). Plaintiffs filed their Response on September 24, 2025 (ECF No. 88), followed by Defendant's Reply on October 1, 2025. (ECF No. 89). Plaintiffs' Sur-Reply was due by October 16, 2025, but they did not file a Sur-Reply. On November 13, 2025, the Court heard

oral argument and testimony from Coleman on PHH's Motion to Exclude Expert Witness. (Hearing Transcript, ECF No. 96).

## IV. EXPERT REPORT

Plaintiffs retained Coleman to render an expert opinion regarding their alleged damages. (ECF No. 82-3 at 2-34). Prior to oral argument, the parties stipulated that the qualifications of Coleman were not being contested by way of Defendant's challenge; the Court entered an Order granting the stipulation. (ECF Nos. 92 & 93). Therefore, the Court will not expound on Coleman's qualifications here. As will be discussed below, however, the Court notes that his credentials bolster this Court's conclusion that his analysis is reliable.

Coleman details his findings and conclusions in the Report. At the outset, he indicates the methodology used to calculate damages and that this methodology has been peer reviewed. (*Id.* at 4). After setting out the equation he employed, in Appendix 2 of the Report (*id.* at 14), he listed 27 documents he reviewed in addition to discussions he had with Joshua Jellison (*id.* at 5).

Coleman notes that Joshua is half owner of a partnership, East Coast Property Maintenance ("East Coast"). In Joshua Jellison's second deposition, he clarifies that East Coast is a limited liability corporation ("LLC"). (Jellison Dep. Vol. II, ECF No. 91 at 11). The LLC engages in road work laying gas lines for Peoples Gas. (*Id.* at 12).

At the time Coleman drafted the Report, the parties had not yet agreed to limit damages to the three elements now in issue: 1) Lost Core Business Expansion; 2) Loss of Mortgage Refinance Opportunity; and 3) Taxes, Insurance and Escrow Issues. Consequently, the Report includes the calculations and conclusions for the Loss of Triaxle Truck Rental Opportunity and Loss of Profit for the House Refurbishing Project. Because these items are no longer in issue, they are not included in the Court's Opinion. Likewise, included in the Stipulation relating to Coleman's

qualifications, the parties further agreed that damages relating to the Loss of Mortgage Refinancing Opportunity and Taxes, Insurance, and Escrow were not being contested by way of Defendant's challenge and hearing on the Motion. (ECF Nos. 92 & 93).

In drafting his Report, Coleman relied on information and documents he obtained from Jellison after directly meeting with him. (ECF No. 82-3 at 7). *See also* Coleman Dep., ECF No. 82-4 at 8; Hearing Transcript, ECF No. 96 at 14-19. As to Lost Core Business Expansion, Coleman calculates Joshua Jellison's damages in the amount of $322,608.00. According to documentation provided by Joshua, Plaintiff first learned of his poor credit score while negotiating a loan to purchase a used dump truck "for hire" in May 2022. (*Id.* at 5 & n.15). Relying on tax returns for the years 2021 through 2023, including the depreciation and amortization schedules, Coleman reports that the business of East Coast grew such that three crews were added over these years. (*Id.* at 7). Coleman further reported that this growth was the result of East Coast's primary client (People's Gas) asking them to take on more business. (*Id.*). According to Jellison, East Coast was offered the opportunity to add a fourth crew. "Had financing been available, the third crew could have been added mid-year 2022 rather than in 2023, when a fourth crew could have been added." (*Id.*) Coleman calculated lost profits to accrue beginning in July 2022 and ending in December 2023. (*Id.*) All calculations are attached as exhibits to the Report of which the Court had the benefit.

In its challenge to strike Coleman's Report and testimony at trial, PHH argues that his opinions are "inherently unreliable" because "his economic damages calculations are predicated entirely on speculative and unverified information provided to him by Mr. Jellison." (Brief in Support of Renewed Motion to Exclude Expert key Coleman, ECF No. 83 at 5). More specifically, PHH argues that Coleman's opinions are based upon Joshua's unsupported and unverified

8

statements regarding (1) his future business plans; (2) the market conditions implicated by those plans; and (3) the viability and potential profits of those "purported plans." (*Id.*). PHH continues that such speculative data does not "fit" the evidence in the case and therefore cannot assist the fact finder.

Plaintiffs respond that Defendant's arguments are nonsensical because only Joshua Jellison could provide the expert with the details of his intention to expand his business. (Plaintiffs' Responsive Brief, ECF No. 88 at 6-7). Rather, Plaintiffs contend that it is up to the jury to evaluate the practicalities of expansion. (*Id.* at 7). In addition, Plaintiffs argue that Coleman may base his opinion on his specialized knowledge as provided in Federal Rule of Evidence 702 (a), especially when calculating economic damages. (*Id.* at 8).

V. LEGAL STANDARD

Federal Rule of Evidence 702, which governs the admissibility of expert testimony, provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) that testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The 2023 Amendments to Rule 702 clarify that the party offering an expert opinion must prove admissibility by a preponderance of the evidence. *See* Fed. R. Evid. 702 advisory committee's note 1 to 2023 amendments. In addition, the amended Rule emphasizes that "each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." Fed. R. Evid. 702 advisory committee's note 2 to 2023 amendments. *See Power v. Hewlett-Packard, Co.*, 2:17-cv-154, 2024 WL 4040432, at *4 (W.D. Pa. July 19, 2024) (2023 amendment "clarifies that expert testimony is not to be presumably admissible, but is instead subject to a preponderance of the evidence standard" and "emphasizes that a court must evaluate the reliability of an expert's conclusions drawn from his or her methodology, not just the methodology itself."). As such, "once the court has found it more likely than not that the admissibility requirement has been met, any attack by the opponent will go only to the weight of the evidence." Fed. R. Evid. 702 advisory committee's note 1 to 2023 amendments.[1]

"The inquiry envisioned by Rule 702 is . . . a flexible one . . . [directed at] the scientific validity—and thus the evidentiary relevance and reliability—of . . . the proposed submission." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 594-95 (1993). According to the United States Court of Appeals for the Third Circuit, under *Daubert*, "district courts perform a gatekeeping function to ensure that expert testimony meets the requirements of Federal Rule of Evidence 702." *Karlo v. Pittsburgh Glass Works, LLC,* 849 F.3d 61, 80 (3d Cir. 2017).

---

[1] The Court applies the current version of Rule 702, which was amended effective December 1, 2023, and applies to new cases and all pending cases "insofar as just and practicable." April 24, 2023, United States Supreme Court Order. The amendment does not substantively alter Rule 702, but rather "clarifies that the preponderance standard applies to the three reliability-based requirements added in 2000--requirements that many courts have incorrectly determined to be governed by the more permissive Rule 104(b) standard." Fed. R. Evid. 702 advisory committee's note 1 to 2023 amendments.

"As a gatekeeper, a trial judge has three duties: (1) confirm the witness is a qualified expert; (2) check the proposed testimony is reliable and relates to matters requiring scientific, technical, or specialized knowledge; and (3) ensure the expert's testimony is 'sufficiently tied to the facts of the case,' so that it 'fits' the dispute and will assist the trier of fact." *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832 (3d Cir. 2020) (quoting *Daubert*, 509 U.S. at 591). *See also Cohen v. Cohen*, 125 F.4th 454, 460 (3d Cir. 2025) (same).[2]

First, as to qualification, "'Rule 702 requires the witness to have specialized knowledge regarding the area of testimony.'" *Jacoby Donner v. Aristone Realty Cap., LLC*, Civil Action No. 17-2206, 2020 WL 5095499, at *7 (E.D. Pa. Aug. 28, 2020) (quoting *Betterbox Commc'ns Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 335 (3d Cir. 2002)) (internal quotation omitted). The Third Circuit has instructed that the qualification requirement be interpreted liberally such that courts may consider an individual's practical experience as well as academic training and credentials. *Bonita Props., LLC v. C & C Marine Maint. Co.*, 2:12cv247, 2017 WL 5197990, at *5 (W.D. Pa. Jan. 6, 2017) (citing *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998)).

Second, concerning reliability, an expert's testimony must be "based on the methods and procedures of science, not on subjective belief and unsupported speculation." *UGI Sunbury*, 949 F.3d at 833-34 (quoting *Karlo*, 849 F.3d at 80-81). But it need not have "the best foundation" or be "supported by the best methodology or unassailable research." *Id.* at 834 (quoting *Karlo*, 849 F.3d at 81). Rather, admissibility turns on "whether the expert's testimony is supported by good grounds." *Id.* (quoting *Karlo*, 849 F.3d at 81). To this end, "[e]ach aspect of the expert's opinion

---

[2] Courts in the Western District of Pennsylvania continue to apply long-standing United States Supreme Court and Third Circuit precedent pertaining to Rule 702 after the adoption of the 2023 clarifying amendments. *See Multiple Energy Tech., LLC v. Under Armour, Inc.*, 2:20-cv-664, 2025 WL 82304, at **1-2 (W.D. Pa. Jan. 13, 2025) (Ranjan, J.); *Power v. Hewlett-Packard Co.*, 2:17-cv-154, 2024 WL 4040432, at **3-4 (W.D. Pa. July 19, 2024) (Hornak, J.); *TAKTL, LLC v. IWR, North America, LLC*, 2:18-cv-1546, 2024 WL 4415194, at **2-4 & n.1 (W.D. Pa. Oct. 4, 2024) (Cercone, J.); *Hadek Protective Sys., B.V. v. Ergon Asphalt & Emulsions, Inc.*, 2:22-cv-1421, 2025 WL 2772338, at **1-3 (W.D. Pa. Sept. 29, 2025) (Dodge, M.J.).

'must be evaluated practically and flexibly without bright-line exclusionary (or inclusionary) rules.'" *Karlo*, 849 F.3d at 81 (quoting *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 291 (3d Cir. 2012)); *see also In re Paoli R.R. Yard PCB Lit.*, 35 F.3d 717, 746 (3d Cir. 1994) ("[T]he issue is whether the evidence should be excluded because the flaw is large enough that the expert lacks good grounds for his or her conclusions."). In determining whether an expert's opinion is supported by "good grounds," courts examine the following factors where appropriate:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Jacoby Donner*, 2020 WL 5095499, at *7 (citing *United States v. Mitchell*, 365 F.3d 215, 235 (3d Cir. 2004)); *Cohen,* 125 F.4th at 462 (same) (citing *UGI Sunbury*, 949 F.3d at 834); Whyte *v. Stanley Black & Decker, Inc.*, 514 F. Supp.3d 684, 694 (W.D. Pa. 2021) (enumerating the above considerations to determine "good grounds."). "These factors are 'neither exhaustive nor applicable in every case.'" *Jacoby Donner*, 2020 WL 5095499, at *7 (quoting *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997)). The proponent of the testimony bears the burden to show "by a preponderance of proof" that the expert's opinion is reliable. *Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3d Cir. 2000) (quoting *Daubert*, 509 U.S. at 593 n.10).

Third, in evaluating "fit," the Court's analysis concerns the testimony's relevancy. *Karlo*, 849 F.3d at 81 (quoting *Daubert*, 509 U.S. at 591). Thus, the Court must determine "whether an expert's testimony . . . 'will help the trier of fact to understand the evidence or to determine a fact in issue.'" *UGI Sunbury*, 949 F.3d at 835 (quoting Fed. R. Evid. 702(a)). "Expert testimony will

meet this standard where 'there is a clear "fit" connecting the issue in the case with the expert's opinion that will aid the jury in determining an issue in the case.'" *American Power, LLC v. Speedco, Inc.*, 1:15-CV-2091, 2017 WL 4084060, at *9 (M.D. Pa. Jan. 17, 2017) (quoting *Meadows v. Anchor Longwall & Rebuild, Inc.*, 306 F. App'x 781, 790 (3d Cir. 2009)). "Testimony that is speculative and based on assumptions does not 'fit' because, unmoored from the evidence in the case, it cannot assist the trier of fact." *In re Lincoln Nat'l COI Rate Litig.*, 620 F. Supp.3d 268, 281 (E.D. Pa. 2022) (citing *UGI Sunbury*, 949 F.3d at 835 (other citation omitted)). *See also Cohen*, 125 F.4th at 464 (testimony of daughter's expert regarding repressed memory did not fit facts of the case where district court did not perform any assessment of daughter's expert and his testimony under Rule 702 independent of the opposing expert; daughter's testimony contradicted the expert's conclusions regarding repressed memories and therefore, his conclusions were not relevant to the facts of the case.).

In sum, and particularly relevant here, is this Court's discussion in *Pritchard v. Dow Agro Sciences*:

> *Daubert* does not require that a party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct. As long as an expert's scientific testimony rests upon "good grounds, based on what is known," it should be tested by the adversary process--competing expert testimony and active cross--examination--rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies.

*Pritchard*, 705 F. Supp.2d 471, 476 (W.D. Pa. 2010) (quoting *United States v. Mitchell*, 365 F.3d 215, 244 (3d Cir. 2004)). *Accord Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, Civil Action No. 09-290, 2012 WL 6562221, at *8 (W.D. Pa. Dec. 15, 2012).

V. ANALYSIS

The thrust of Defendant's argument is that Coleman's computations are inherently unreliable because they are premised upon speculative information provided by Joshua Jellison. At oral argument, PHH stressed that Coleman bases his opinion solely on what Jellison told him about demand for expanding his business. (ECF No. 96 at 46). This Court and others, however, have noted that an owner of a business who participates in day-to-day operations is qualified to offer an opinion as to lost profits based on the company's actual operating history. *Autoforge, Inc. v. American Axle & Mfg., Inc.*, Civil Action No. 02-1265, 2008 WL 65603 (W.D. Pa. Jan. 4, 2008). Although not offering Jellison's lay opinion pursuant to Federal Rule of Evidence 701, *Autoforge* and the cases cited therein support Coleman's reliance on information supplied by Jellison, especially as it relates to the historical business data for which Jellison has first-hand information. The historical business information supplied by Jellison and relied upon by Coleman is based upon Jellison's personal knowledge acquired from the day-to-day operations of East Coast. In fact, circuit courts have held that persons outside of a business, including financial consultants, "are not able to establish the requisite foundation of personal knowledge and may not offer a lay opinion as to value or project lost profits of a business." *Autoforge,* 2008 WL 65603, at *7 (citing *DIJO, Inc. v. Hilton Hotels Corp.*, 351 F.3d 679 (5th Cir. 2003) (holding that district court abused its discretion in permitting a financial consultant, who was never employed by a business, to offer a lay opinion as to the value of the business because the financial consultant did not "have the type of first-hand knowledge necessary to provide reliable forecasts of future lost profits.")); *JGR v. Thomasville Furniture Indust.*, 370 F.3d 519 (6th Cir. 2004) (holding that the district court abused its discretion by permitting a witness, an attorney and CPA, with no personal knowledge of the business, other than to prepare a damages report for litigation, to offer lay opinion testimony as to the value of lost profits.). These cases demonstrate that business owners involved in day-to-day

operations may provide reliable historical business data relating to lost profits. As such, Coleman was justified in relying upon his discussions with Jellison, in conjunction with tax returns and other documents which corroborated Jellison's representations concerning lost profits relating to expansion of his business. *See TAKTL, LLC v. IWR, North America, LLC*, 2:18-cv-1546, 2024 WL 4415194, at *5 (W.D. Pa. Oct. 4, 2024) (quoting *Corner Pocket, Inc. v. Travelers Ins.*, No. Civ. A. 12-288, 2013 WL 3993967, at *6 (W.D. Pa. Aug. 5, 2013) ("'[Expert] may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.'" Fed. R. Evid. 703. "So, he 'need not base his opinion on first-hand knowledge, and in fact can rely on observations made by others as well as their own expertise.'").

In its Reply brief, PHH attempts to discredit Coleman's methodology by quoting *Bonita Props.*, 2017 WL 5197990, at *3 (W.D. Pa. Jan. 6, 2017), for the proposition that establishing lost profits of a business is difficult, and that along with expert testimony, "economic and financial data, market surveys and analyses, business records of similar enterprises, and the like[]" may establish lost profits with reasonable certainty. This language in *Bonita* concerns the court's discussion of establishing lost profits of a *new* business. *Id.* Here, Coleman is opining on the loss of the opportunity to expand an *existing* business. As to establishing lost profits for an existing business, the *Bonita* court stated that "[c]ases in Pennsylvania involving lost profits indicate that the courts are reluctant to award such damages, '*except when the business concerned is established and not new and untried*.'" *Id.* (quoting *Delahanty v. First Pa. Bank, N.A.*, 464 A.2d 1243, 1258 (Pa. Super. Ct. 1983)) (emphasis added). Here, East Coast is an established business. Historically, it enjoyed increasing sales revenue from 2021 through 2023. (Report, ECF No. 82-3 at 7). Moreover, because Coleman's Report relies upon data from tax returns for years 2021 through

2023, which reveals not only sales revenue but also depreciation and amortization of equipment needed for the addition of new crews in 2022 and 2023, the data is relevant to the facts of the case.

In a more closely analogous case involving an expert's damages report, the district court held that an expert's opinion was admissible where the expert relied upon business documents and his interviews of the executive team. *TAKTL,* 2024 WL 4415194, at *5. In *TAKTL*, a breach of commercial construction contract case involving the manufacture of specialty concrete panels, the party challenging the damages report argued, *inter alia*, that the expert failed to consider variables and facts beyond those provided by the client. *Id.* The *TAKTL* court noted that whether the expert should have considered more is an issue that goes to the weight of the evidence, rather than its admissibility. *Id.* The court also noted that "'[a]n expert is permitted to base his opinion on a particular version of disputed facts and the weight to be accorded to that opinion is for the jury.'" *Id.* (quoting *Walker v. Gordon*, 46 F. App'x 691, 695-96 (3d Cir. 2002)). Accordingly, concluded the court, any "limitations or deficiencies in [the expert's] evaluation" may be explored "'through effective cross-examination.'" *Id.* (quoting *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002)).

Turning to other cases cited by Defendant, PHH also relies on *Bruno v. Bozzuto's, Inc.*, 311 F.R.D. 124 (M.D. Pa. 2015) and other cases, for the proposition that Coleman's Report should be excluded because Coleman did not verify the facts reported to him by Joshua Jellison. *Bruno* and other cases are readily distinguishable. In *Bruno*, a married couple owned a small supermarket chain. The wife was a CPA with nearly 20 years of accounting experience. Eight months before filing the lawsuit, and some 15 months after initially contemplating litigation, the wife destroyed all the business' financial records, including those saved on a store computer. That spoliation forced plaintiffs' own experts to rely on secondhand sales projections. The secondhand sales

16

projections were in fact generated internally by defendants, who had subsequently rejected those projections as being grossly overstated. *Bruno*, 311 F.R.D. at 127-28. Plaintiffs' experts failed to verify the projections. Judge Brann noted that "the very flaws evident in the contested reports exist precisely because their core inputs were drawn from a well that Plaintiffs themselves had poisoned from the outset." *Id.* at 125. The secondhand sales projections were excluded.

In a similar case, an expert's opinion was excluded because the factual material the expert relied upon was totally consumed by fire. In *American Power,* 2017 WL 4084060, at \*\*8-10, *aff'd,* 2017 WL 4150463 (M.D. Pa. Aug. 24, 2017), Magistrate Judge Carlson noted that the loss of this material was "particularly unfortunate" because "it is now undisputed that the evidence [the expert] claims to have relied upon in formulating this opinion either never existed, or demonstrably contradicts his factual assertions." *Id.* at 3. Namely, video evidence, along with other evidence relied upon by the expert, contradicted the facts as described by the expert. Accordingly, the court granted the motion to exclude the expert's testimony because it lacked the necessary reliability and fit to the facts of the case. *See also Jacoby Donner*, 2020 WL 5095499, at \*\*20-21 (Expert's calculations of remedial legal fees and settlement payments excluded as unreliable because expert failed to do "basic due diligence" on the invoices provided to him); *Zenith Electronics Corp. v. WH-TV Broad. Corp*, 395 F.3d 416 (7th Cir. 2005) (expert excluded where his only basis for supporting his profit projections was "his expertise." He "made no effort to calculate the potential subscriber base or use data from other markets . . . to inform his projection . . . ." *Ipse dixit* of the expert is not enough.); *CareDx, Inc. v. Natera, Inc.*, Civil Action No. 19-662, 2021 WL 1840646, at \*\*3-4 (D. Del. May 7, 2021) (Expert's corrective advertising opinions did not contain specialized knowledge, but merely employed simple multiplication calculations based solely on

CEO's "rough" estimates in his deposition testimony; no underlying documentation was reviewed to test CEO's "rough" data.).

Here, the information provided by Joshua Jellison is corroborated by East Coast's tax returns. As Coleman testified at the hearing and oral argument, the information he received from Jellison is supported by this documentation from East Coast:

> First of all, I determined from Mr. Jellison, that he had in fact added a second crew in 2022. And in 2023, he had in fact added a third crew. And then I, in looking at his tax returns . . . I consider as the gold standard of a small business and personal documentation because they've been reviewed in this case by his—or they've been looked at at least by his accountant and they've also been sent to the IRS. So he provided me with five years of tax returns. And I reviewed this. In my report specifically, I highlighted some of the information shown from 2021 to 2023.
>
> . . .
>
> In doing so, I noted the years in which he added a crew, like in 2022, his net income went up significantly. And in 2023, he also added a crew and his net income went up significantly.
>
> . . .
>
> When he said: I've added a crew in 2022, I've added a crew in 2023, you can look at his tax returns and see that $300,000 extra salaries is [sic] added to those. But you can also see, just from my report on page 6, that he had asserted to me that it takes about $500,000 of equipment to support a new crew.
>
> In 2022, the company bought $602,000 worth of equipment. In 2023, they bought $423,000 and-some-change, of equipment. So the average of those two is very close –just over $500,000 a year.
>
> . . .
>
> My analysis is, it's very clear in that I assumed that he could have added a crew in 2022—a second crew in 2022 instead of 2023. And then that he could have added one in 2023. But I only assumed that he would have run that crew for a year and a half.
>
> . . . .
>
> And again, the numbers underlying this analysis are from the tax returns, which I consider as reliable documentation.

(ECF No. 96 at 15-19). *See also* ECF No. 96 at 21, 32.

Other documents Coleman relied upon include those reflecting the dramatic drop in Jellison's credit score; 2022 Depreciation and Amortization Report; Automobile Schedule for East Coast Equipment; Refusal for Small Business Line of Credit from PNC Bank; Delinquent Tax Reminder from Westmoreland County Tax Claim Bureau; 2019-2023 Tax Returns of Partnership Income with supporting documentation; and other documents. Tax records include information relating to equipment costs when adding the second and third crews in 2022 and 2023. (Report, ECF No. 82-3 at 14). *See also* ECF No. 96 at 31-32. Coleman outlines the methodology he used based on information he received from Jellison and supported by this documentation. Thus, there is an adequate factual foundation for Coleman's opinions. *See Stecyk,* 295 F.3d at 414 (presence of hydraulic fluid solvent in places it should not have been provided factual foundation for expert testimony concerning source of flammable fluid). This factual foundation establishes a clear "fit" connecting Plaintiffs' alleged damages with Coleman's opinion. The cases relied upon by PHH simply do not carry the day.

In sum, in its discretion and considering all facts and circumstances, the Court finds by preponderance of the evidence that Coleman's Report is supported by "good grounds," and relevant such that it will assist the trier of fact. As such, Coleman's Report and testimony will be admitted. Coleman relied upon business tax returns, which were prepared by an outside accountant, and reviewed by the IRS. (ECF No. 96 at 15). Coleman was able to corroborate Joshua Jellison's representations from these documents. PHH, however, may conduct a thorough and vigorous cross examination of Coleman and Joshua Jellison at trial concerning future business plans and the market conditions supporting those plans.

VI. CONCLUSION

PHH Mortgage Corp.'s Renewed Motion in Limine to Exclude Expert Witness Key Coleman (ECF No. 82) is DENIED.

An appropriate Order follows.

Dated: January 20, 2026

*s/Nora Barry Fischer*
Nora Barry Fischer
Senior U.S. District Judge

cc/ecf:  All counsel of record